## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | | |
|---|---|---|
| **ALEX SIZEMORE,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:05-0241** |
| | ) | |
| **JIM RUBENSTEIN, Commissioner,** | ) | |
| **West Virginia Division of Corrections,** | ) | |
| **Respondent.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

On March 23, 2005, Petitioner, an inmate at Mount Olive Correctional Complex [MOCC], by counsel, Paul S. Detch, Esquire, filed his Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus By a Person in State Custody and Brief in support. (Document Nos. 1-2.) Petitioner alleges the following grounds for *habeas* relief:

> **Ground One**: The Sanctity of the Jury was Violated.
> **Supporting Facts**: The sanctity of the jury was violated by: the Bailiff reported the deliberations of the Jury to the parties, the Jury conducted an unauthorized out of court experiment; one of the Jurors was exchanging hand signals with members of the family refuge center; The Court placed undue pressure on the minority members of the jury by holding the jury hostage, requiring they deliberate into the night with no instruction on their right to adjourn; the Jury's sequestration was violated through a telephone call to a third party; one of the Jurors was related to a witness, and after the trial it was shown that a witness had accused this Juror's cousin of similar sexual improprieties. (Doc. No. 1 at 6.)

> **Ground Two**: The State of West Virginia Violated the Discovery Rules and <u>Brady v. Maryland</u>, by not reve[a]ling that the State knew of other Accusations that the Complaining Witness Made that Were Known to Be False.
> **Supporting Facts**: The Complaining Witness in this case, E.B., has a history of making false allegations regarding sexual improprieties. Specific improprieties are detail[ed] in the attached brief. Had the defense known of her history the information could have been sed to impeach the witness's credibility and enhance the credibility of the defendant. (Doc.No. 1 at 7.)

> **Ground Three**: Defendant, Alex Sizemore, was prejudiced and denied a fair trial and, the effective assistance of counsel, when the State of West Virginia through it's

Prosecuting Attorney revealed to the jury that the defendant's own counsel, Mark Burnette, had disclosed confidential work product information to the State, i.e. that the defendant's counsel had provided to the State that a potential defense witness, Heather Bowling, claimed that the Defendant had admitted various allegations to her at an Elk's Club parking lot.

> **Supporting Facts**: Throughout the trial o this matter the Prosecuting Attorney and Defense Counsel argued about how the State of West Virginia had discovered information regarding a possible confession by the Defendant. The State's Prosecutor stated that he had been told of this information by defense counsel. If that is the case, then the defendant was denied effective representation by his counsel disclosing confidential work product. (Doc. No. 1 at 9.)

**Ground Four**: Alex Sizemore was denied effective assistance of counsel in violation of the United States Constitution.

> **Supporting Facts**: Defense Counsel failed to present the defense; Defense Counsel failed to impeach State's Witnesses; The Defendant's Counsel waived the Defendant's constitutional rights; Defense Counsel allowed the State Police to testify that they believed the victim; The Defense Counsel failed to offer instructions. (Doc. No. 1 at 11.)

**Ground Five**: The Court erred in not considering the defendant for alternative sentencing, probation or as a youthful male offender because he would not admit that he had committed perjury at trial and confess to the accusations.

> **Supporting Facts**: West Virginia has a statute that requires sexual offenders to be in a treatment program before they can be eligible for probation. Most of these programs require that the defendant admit to the sexual acts before they can be admitted. However, Alex Sizemore found a treatment program that would not require him to admit to inappropriate acts. The trial court would not accept this program. (Doc. No. 1 at 12.)

By Standing Order filed on March 23, 2005, this matter was referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Doc. No. 3.)

## PROCEDURAL HISTORY

On June 5, 2001, the Grand Jury of Greenbrier County, West Virginia, returned a single count Indictment against Petitioner, charging him with sexual assault in the first degree in violation of West Virginia [W.Va.] Code § 61-8B-3. State v. Sizemore, Criminal Action No. 01-F-31 (Cir. Ct. Greenbrier Co. Mar. 24, 2003). (Doc. No. 9, Exhibit 1.) On July 12, 2002, after a three day jury trial,

Petitioner was convicted of first degree sexual assault. (Doc. No. 9, Exhibit 2.) By Order entered March 24, 2003, Petitioner was sentenced to an indeterminate term of imprisonment in the state penitentiary of 15 to 35 years, and a $5,000.00 fine. (Id.)

On August 19, 2002, Petitioner filed his Motion for Judgment of Acquittal, or in the Alternative, Motion for a New Trial, in which he raised the following grounds for relief:

1. The trial Court erred in its interpretation of West Virginia's "Rape Shield Law," which prevented Defendant from confronting the witness against him.

2. The trial Court erred in its refusal to allow Defendant to introduce evidence of an inducement given to a witness and family member of other witnesses.

3. The State failed to disclose a tape recorded witness statement, and that failure to disclose prejudiced Defendant.

4. The State failed to disclose an inducement to a witness and family member of other witnesses.

5. The trial Court erred by allowing the State to introduce evidence regarding Defendant's character without Defendant first placing his character into issue.

6. The trial Court erred by allowing evidence of at least two of Defendant's other alleged crimes, wrongs or acts that should have been prohibited.

7. The prosecuting attorney asked inappropriate questions of witnesses that suggested he had evidence that he did not have.

8. One or more of the jurors had inappropriate contact and/or communication with one or more representatives of a domestic violence agency that represented the alleged victim.

9. The prosecuting attorney made inappropriate closing argument that: (1) misstated statements by defense counsel and witnesses; and (2) repeatedly referred to defense counsel by name as if he was on trial.

10. The trial Court erred by making numerous inappropriate and erroneous comments/objections that gave the appearance of the Court's lack of impartiality.

11. One or more of the jurors had inappropriate contact and/or communication with persons who were not jurors during deliberations.

3

12. The prosecuting attorney inappropriately conducted voir dire of the jury.

13. The trial Court erred in refusing to allow defense counsel to ask a question of the potential jurors during voir dire regarding alternative sources of knowledge by an eleven-year-old girl of sexual terms, language and conduct.

(Doc. No. 10, Exh. 17.) On October 7, 2002, Petitioner filed a further Motion for New Trial, alleging the following grounds for relief:

1. The defendant's counsel has been informed by two jurors, Kelly Green and Lonnie Spencer that two male jurors whose identity at this time is unknown, did an experiment during the course of the trial which was reported to the other jurors. Reportedly, the two male jurors owned pickup trucks of comparable make and model to that of the defendant's and did an experiment to determine whether the State's witness could have viewed the crime scene through the side door mirror of the truck. This discredited the defense counsel because the jury would believe that he was not presenting all of the evidence in the case and may have lead other jurors to feel they should not consider the evidence. The sequestration of the jury lead others to feel they should not consider this evidence.

2. The sequestration of the jury was violated by the bailiff, who reported during the course of the deliberations the vote and the identity of the juror, who was voting to acquit.

3. The sequestration of the jury was violated in that at approximately 6:30 p.m. to 7:00 p.m. one of the jurors, Kelly Green made a telephone call. The contents of the said telephone communication are at this time unknown to your defendant. This telephone communication however was made outside the presence of the Court and was not authorized and to your defendant's knowledge no instruction was given to the jurors as to the type and form of communications that the could make during their deliberations. A portion of the conversation was overhead and Kelly Green was heard to say "they are hounding me, what am I going to do."

4. During the course of the trial and during deliberations one juror, John Mooney, who had previous connections with the Family Refuge Center, was seen making gestures and hand communications to a one Kathy Ewing in the form of hand signs in which he gestured what was the jury vote. He also signaled with an o.k. sign and a wink to Kathy Ewing.

5. The sequestration rules of the Court were violated when [E.B.] broke down during her testimony and was escorted out of the court room by a member of the Family Refuge Center who had been watching the trial. When she returned from the jury room [E.B.] told the jury about the tinting of the truck windows. This had the appearance she was coached outside the court room. The Court gave no

4

instructions to the parties not to discuss their testimony.

6. The sequestration rules were violated when a Ms. Joy Rudd escorted [A.Y.] out of the courtroom while she was on the witness stand.

7. During the course of the trial various statements by the alleged victim to other parties, including her mother, which were in violation of the hearsay rule, were permitted to go to the jury without objection, had defense counsel properly objected to the statements, the prosecuting attorney would not have been able to elude to statements as though they were consistent statements and that the alleged victim was consistent in her tesitmony.

8. The Court allowed the jury to deliberate into the late evening. This created a coercive environment so that the majority could impose their will on the minority jurors. The Court gave no instructions as to how the jury should handle the late evening deliberations.

9. Evidence was made available to the jury that the defendant, Alex Sizemore had relationships with Jessica Rudd Kinkaid. This was prejudicial to the defendant and that no 404(b) hearing on these other relationship[s] were had. No crime had been committed or could be proven. The prosecutor tried to establish a pattern of conduct which was false and prejudicial.

(Doc. No. 10, Exh. 18.)

Petitioner supplemented his second Motion for a New Trial on December 3, 2002, alleging the following grounds:

1. The defendant Alex Sizemore was denied the effective assistance of counsel on his appeal, denied his rights of due process and his right to a public trial as guaranteed to him by the Constitution of the United States and the State of West Virginia, when the official court reporter failed to record the bench conferences and objections of counsel, orders of the Court and replies of the State throughout the trial.

2. The defendant, Alex Sizemore was prejudiced and denied a fair trial, the effective assistance of counsel and his due process rights as guaranteed under the State of West Virginia and the Constitution of the United States, when the State of West Virginia through its prosecuting attorney revealed to the jury that the defendant's own counsel, Mark Burnette had disclosed confidential work product information to the State. The trial court record reveals that Mark Burnette, defendant's own counsel, told the prosecuting attorney, Stephen Dolly, that a potential defense witness, Heather Bowling, claimed that the defendant had admitted various allegations to her at an Elk's Club parking lot. The manner in which the State

5

presented this revelation and the counsel's reply was highly prejudicial to the defendant.

3. The State of West Virginia violated the West Virginia Trial Court rule 42.03 by engaging in individual voir dire of individual juror members. Rule 42.03 reads as follow: "the judicial officer may allow individual voir dire by the attorney upon a showing of good cause or where questioning such juror in open court in the presence of the other jury panel member would be prejudicial or cause undo embarrassment to the prospective juror."

4. The defendant was denied the effective assistance of counsel and was over matched by the prosecuting attorney, Steve Dolly, throughout the trial.

5. There existed a course of conduct or pattern that made defense counsel ineffective and states he was overmatched by the State.

(Exh. 19.) Finally, on December 3, 2002, Petitioner filed his third Motion for New Trial, alleging the

following newly discovered evidence:

1. During the course of trial, an investigation had revealed that [E.B.] had on another occasion falsely accused Alex Sizemore of engaging in oral sex with another companion. This alleged encounter was denied and evidence established that [E.B.] falsely made the accusation.

2. Your defendant Alex Sizemore has learned for the first time on December 3, 2002, that [E.B.] has made other false accusations of sexual improprieties with other young men in the community which are known to be false. [A.Y.] has come forward[ ] and indicated that [E.B.] has falsely accused a Dowdy boy, son of Donna Dowdy, at a time when it was impossible for the sexual encounter to have occurred. [A.Y.] further informs the counsel for the defendant that she was present when other young people discussed [E.B.] having made other false accusations against other parties. There may be other witnesses who will step forward who will have additional information that the said [E.B.] has made false accusations against other individuals.

3. The information in combination with the known evidence that [E.B.] engages in a pattern of falsely accusing people of sexual encounters, particularly of the nature of oral sex would raise a reasonable doubt as to her veracity in claiming the defendant Alex Sizemore performed such an act and would raise a reasonable doubt as to the guilt of Alex Sizemore.

(Exh. 20.)

On October 3, 2003, Petitioner, by counsel, appealed his conviction and sentence to the Supreme

Court of Appeals of West Virginia [SCAWV], raising the following assignments of error:

1. The trial court erred in not granting the defendant's Motion for a New Trial when it was revealed that the sanctity of the jury was violated when:

    (1) The bailiff had been reporting the deliberations of the jury to the parties. Post trial motions denied.
    (2) The jury had conducted an unauthorized experiment. Post trial motion denied.
    (3) One of the jurors was exchanging hand signals with members of the Family Refuge Center. Post trial motion denied.
    (4) The Court placed undue pressure on the minority members of the jury by holding the jury hostage by requiring that they deliberate into the night with no instruction to them as to their right to adjourn. Post trial motion denied.
    (5) The sequestration of the jury was violated when one of the jurors made a telephone call to [a] third party during a break in the deliberations. Post trial motion denied.
    (6) One of the jurors was a cousin to a witness, and it later was developed that after the trial that a witness had accused the juror's cousin of a similar sexual impropriety.
    (7) The Court permitted improper jury voir dire by the prosecution that violated Rule 42.03 of the Trial Court Rules of Evidence. Denied objection at trial. {Vol. I P. 63} and Post trial motion denied.

2. The lower court erred in failing to grant a new trial when it was revealed the defendant was denied the opportunity to present the defense that the complaining witness, E.B., made other provably false allegations and (1) the State failed to disclose the false allegations and (2) the Court misused the Rape Shield law to prevent the use of the information. Post trial motion denied. Rape Shield Ruling preserved at hearing {Vol. II P 121}.

3. The lower Court erred in denying defendant post trial motions that the prosecuting attorney revealed to the jury that the defendant's own counsel, Mark Burnette, had disclosed confidential work product information to the State, i.e. that the defendant's cousing had provided to the State a witness, Heather Bowling, who claimed that the defendant had admitted various allegations to her at an Elk's Club parking lot. The Trial Court refused to act on request in trial and denied motion post trial.

4. The Trial Court erred in failing to give limiting instructions following the introduction of evidence that the defendant, Alex Sizemore, had dated a witness, Jessica Rudd Kinkaid, when she was only thirteen.

5. The lower Court erred in failing to grant a new trial when it was shown the defendant was denied effective assistance of counsel for the reasons set out below.

6. The lower court erred in not considering the defendant for alternative sentencing because he would not admit that he had committed perjury at trial and confess to the accusations.

(Doc. No. 10, Exhibit 15.) The SCAWV refused Petitioner's Petition by Order entered March 31, 2004. State v. Sizemore, Case No. 032150 (W.Va. Mar. 31, 2004). (Id.)

Petitioner filed his instant Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus By a Person in State Custody on March 23, 2005. (Doc. No. 1.) By Order entered March 24, 2005, the undersigned directed Respondent to show cause, if any, why Petitioner's Petition should not be granted. (Doc. No. 4.) On June 20, 2005, in response to the Court's Order, Respondent filed his "Consolidated Answer, Motion to Dismiss, Motion for Summary Judgment and Memorandum in Support Thereof," with exhibits. (Docs Nos. 8-10.) Petitioner filed his Reply on September 15, 2005 (Doc. No. 13.), to which Respondent filed a further Reply on September 26, 2005. (Doc. No. 14.) On October 11, 2005, Petitioner moved to strike Respondent's second Reply, or in the alternative, for additional time to respond. (Doc. No. 15.) By Order entered October 12, 2005, the Court denied Petitioner's Motion to Strike and granted him the opportunity to file an additional response. (Doc. No. 16.) Petitioner filed his Response to Respondent's Reply on November 1, 2005. (Doc. No. 18.)

## EXHAUSTION OF STATE REMEDIES

Respondent contends that Petitioner procedurally defaulted many of his claims when he failed to preserve the alleged errors at the trial court level (Doc. No. 8 at 21-22.) and when he presented his arguments as federal constitutional violations for the first time in his direct appeal. (Id. at 18-21.) Respondent therefore argues that Petitioner's following claims must be dismissed for failure to exhaust state remedies:

Petitioner has failed to exhaust his federal confrontation claim. The trial court was never given the opportunity to address it. . . . Petitioner has also failed to exhaust his Brady claim as it pertains to the victim's counseling records, and his Daubert

8

argument as it applies to his juror misconduct claim. Because he never argued that his trial counsel failed to present a defense, that counsel waived his constitutional right to remain silent, that counsel allowed State Trooper Cooper to testify that he "believed the victim," and that he failed to offer the proper West Virginia Rule of Evidence 404(b) instructions to the trial court they are not exhausted.

Even if this Court were to rule that the claims are not exhausted, Petitioner has procedurally defaulted any claims not preserved at trial or on post-trial motions. The state court's raise or waive rule is a firmly entrenched rule of state appellate procedure. By failing to raise constitutional violations before the trial court, Petitioner lost his right to present them in his direct appeal. The state supreme court summarily rejected his petition, and pursuant to W.Va. R. App. P. 16 refused to consider Petitioner's Crawford argument. Rule 16 is a[n] independent and adequate state procedural rule. Although he has procedurally defaulted this claim, Petitioner may still raise his Crawford argument in a state habeas petition. See W.Va. Code § 53-4A-1(d).

(Doc. No. 8 at 18-22.)

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 [AEDPA], effective April 24, 1996, provides that state prisoners must exhaust available state remedies prior to filing a § 2254 petition in federal court. 28 U.S.C. § 2254(b)(1)(A); see also, McDaniel v. Holland, 631 F.Supp. 1544, 1545 (S.D. W.Va. 1986)("A federal court will not entertain a state prisoner's petition for a writ of habeas corpus unless the prisoner has first exhausted available state judicial remedies."). Section 2254(b)(1)'s exhaustion requirement can be satisfied in either one of two ways: (1) the Petitioner can fairly present all claims in state court, or (2) the Petitioner's claims will be deemed exhausted if no state remedies are currently available. See Gray v. Netherland, 518 U.S. 152, 161, 116 S.Ct. 2074, 2080, 135 L.Ed.2d 457 (1996). Fair presentation  requires the Petitioner to (1) present the same claims (2) to all appropriate state courts. See Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997). Presentation of the same claim "contemplates that 'both the operative facts and the 'controlling legal principles'' must be presented to the state court." Id. (quoting Verdin v. O'Leary, 972 F.2d 1467, 1474 (7th Cir. 1992) (quoting Picard v. Connor, 404 U.S. 270, 277, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971)). The requirement of presentation of the same

9

claim to all appropriate state courts is designed to give "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999). This requirement is satisfied by presentation to the state's highest court on either direct or collateral review. See O'Sullivan, 526 U.S. at 844, 119 S.Ct. at 1732. Furthermore, it is well established in this jurisdiction that "unless with prejudice, summary dismissals of habeas petitions invoking the original jurisdiction of the West Virginia Supreme Court will not satisfy exhaustion requirements." Moore v. Kirby, 879 F.Supp. 592, 593 (S.D. W.Va. 1995); see also, McDaniel v. Holland, 631 F.Supp. at 1546.

When the state courts refuse to review a petitioner's claims based on the petitioner's failure to comply with state procedural rules, the petitioner's claims are said to be procedurally defaulted. See e.g., Mason v. Procunier, 748 F.2d 852 (4th Cir. 1984), cert. denied sub nom., Mason v. Sielaff, 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985). Under such circumstances, the petitioner's claims will be considered exhausted if the state procedural rule is adequate and independent. A state procedural rule is adequate "only if it is a 'firmly established and regularly followed state practice.'" Keel v. French, 162 F.3d 263, 268 (4th Cir. 1998), cert. denied, 527 U.S. 1011, 119 S.Ct. 2353, 144 L.Ed.2d 249 (1999)(internal citations omitted). The Fourth Circuit has held that unambiguous state statutes and court rules are always firmly established. See Weeks v. Angelone, 176 F.3d 249, 270 (4th Cir. 1999), aff'd, 528 U.S. 225, 125 S.Ct. 727, 145 L.Ed.2d 727 (2000). A state procedural rule is independent if "it does not 'depend on a federal constitutional ruling.'" Burket v. Angelone, 208 F.3d 172, 183 (4th Cir. 2000), cert. denied, 530 U.S. 1283, 120 S.Ct. 2761, 147 L.Ed.2d 1022 (2001)(*quoting* Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)). Procedurally defaulted claims are considered exhausted for federal *habeas* purposes.

Claims that have been procedurally defaulted will not receive federal *habeas* review, however, unless the petitioner can establish either "cause and prejudice" for the default, or actual innocence. See Thomas v. Davis, 192 F.3d 445, 450 n.2 (4th Cir. 1999); Mueller v. Angelone, 181 F.3d 557, 584 (4th Cir.), cert. denied, 527 U.S. 1065, 120 S.Ct. 37, 144 L.Ed.2d 839 (1999). Cause is established when an objective factor external to the petitioner's actions impeded the ability to comply with the state's procedural rule. See Strickler v. Greene, 527 U.S. 263, 283 n.24, 119 S.Ct. 1936, 1949 n.24, 144 L.Ed.2d 286 (1999). Petitioner, however, must exhibit reasonable diligence to establish cause.  See Hoke v. Netherland, 92 F.3d 1350, 1354 n.1 (4th Cir.), cert. denied, 519 U.S. 1048, 117 S.Ct. 630, 136 L.Ed.2d 548 (1996). Prejudice must be actual; the petitioner must show that the trial was infected with actual constitutional error which worked to his disadvantage. See McCarver v. Lee, 221 F.3d 583, 592 (4th Cir. 2000), cert. denied, 531 U.S. 1089, 121 S.Ct. 809, 148 L.Ed.2d 694 (2001); Tucker v. Catoe, 221 F.3d 600, 615 (4th Cir.), cert. denied, 531 U.S. 1054, 121 S.Ct. 661, 148 L.Ed.2d 563 (2000).

In determining whether a petitioner's claim is procedurally defaulted, the "relevant state court decision for purposes of the inquiry is that 'of the last state court to be presented with the particular federal claim' at issue." Skipper v. French, 130 F.3d 603, 609 (4th Cir. 1997)(internal citations omitted). However, "[t]o find a claim thus foreclosed, it is not sufficient that the state court *could* have applied a procedural default under state law; it must actually have done so." Id. In the instant matter, the SCAWV, the last court to be presented with Petitioner's claims at issue, refused Petitioner's Petition for Appeal, without stating any reason for its refusal. While it was possible for the SCAWV to have found Petitioner's claims procedurally defaulted under state law, it did not. Accordingly, the undersigned cannot find that Petitioner's claims are procedurally defaulted. Rather the undersigned finds that Petitioner has exhausted his claims under 28 U.S.C. § 2254(b)(1)(A).

11

**STANDARDS OF REVIEW**

Federal *habeas* relief is available to a state prisoner under 28 U.S.C. § 2254, only if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(2002); see also Sargent v. Waters, 71 F.3d 158, 160 (4th Cir. 1995). Section 2254(d) provides that when the issues raised in a § 2254 Petition were raised and considered on the merits in State Court *habeas* proceedings, federal *habeas* relief is unavailable unless the State Court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court stated that under the "contrary to" clause in § 2254(d)(1), a federal *habeas* Court may grant *habeas* relief "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S.Ct. at1523. A federal *habeas* Court may grant relief under the "unreasonable application" clause of § 2254(d)(1) where the State Court identified the appropriate Supreme Court precedent but unreasonably applied the governing principles. Id. In determining whether the State Court's decision was contrary to, or was an unreasonable application of, Supreme Court precedent, all factual determinations by the State Court are entitled to a presumption of correctness with the burden placed on Petitioner to rebut the

presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[1]

When a State court fails to address an issue, or fails to articulate a rationale behind its ruling, the federal courts "must independently review the record and the applicable law; however, the review is not a de novo review. See Bell v. Jarvis, 236 F.3d 149, 163 (4th Cir. 2000), cert denied sub nom., 534 U.S. 830, 122 S.Ct. 74, 151 L.Ed.2d 39 (2001). Rather, it is a deferential review to determine if the State court's decision is legally and factually reasonable. Id. The SCAWV summarily refused Petitioner's direct appeal. Petitioner did not seek *habeas* relief in the State courts. The United States Court of Appeals for the Fourth Circuit has consistently held that "a summary state court decision on the merits of a federal constitutional claim is an 'adjudication' of the claim for purposes of § 2254(d)." Bell v. Jarvis, 236 F.3d at 163. Beginning with Wright v. Angelone, 151 F.3d 151, 157 (4th Cir. 1998), and continuing with Weeks v. Angelone, 176 F.3d 249, 257 (4th Cir. 1999), aff'd, 528

---

[1] Title 28, U.S.C. Section 2254(e) provides:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
    (A) the claim relies on –
        (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000), Baker v. Corcoran, 220 F.3d 276, 291 n.14 (4th Cir. 2000), cert. denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 110 (2001), Bacon v. Lee, 225 F.3d 470, 478 (4th Cir. 2000), cert. denied, 532 U.S. 950, 121 S.Ct. 1420, 149 L.Ed.2d 360 (2001), and concluding with Bell v. Jarvis, the Fourth Circuit has ruled, in a variety of procedural contexts, that federal courts are limited to a deferential review of the result of State Court decisions.

Based upon Bell v. Jarvis, the undersigned proposes that the District Court **FIND** that the SCAWV decision was an adjudication on the merits for purposes of § 2254(d). The SCAWV, however, did not articulate the rationale behind its ruling refusing Petitioner's direct appeal. Therefore, as to any grounds not addressed by the SCAWV, the undersigned proposes that the District Court **FIND** that the appropriate standard of review is an independent, but deferential, review of the record and the applicable law to determine whether the state courts' decisions (i.e., the "results") were legally or factually unreasonable.

**Summary Judgment**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477

14

U.S. at 322 - 23, 106 S.Ct. at 2552 - 53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 - 48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Petitioner's claims, summary judgment is appropriate.

## **FACTUAL BACKGROUND**

Trial testimony revealed that on March 1, 2001, Petitioner, went to 40 Oaks, a trailer park near Lewisburg, West Virginia, to pick up his girlfriend, Heather Bowling, for their date. (Exh. 3 at 167-71.) While waiting for Heather to finish getting ready, Petitioner was approached by Heather's fourteen-year-old sister, Amanda Bowling, who asked Petitioner to take her and a friend to Chester's Garage, approximately a quarter of a mile away, to buy soda. (Exh. 3 at 167-68.) Amanda initially asked her friend, A.Y., to go with her, but she was unable to obtain permission to go. (Exh. 3 at 167-68.) Amanda therefore, asked E.B., her eleven-year-old friend, to go with her. (Exh. 3 at 169.) E.B. claimed that while Amanda was getting the sodas, she performed oral sex on Petitioner. (Exh. 3 at 22-24.)

The State first presented the testimony of Amanda Bowling. Amanda testified that on March 1, 2001, at approximately 5:30 p.m., Petitioner drove her and E.B. in his truck to Chester's to buy soda. (Exh. 3 at 171.) Amanda sat in the passenger seat and E.B. sat on the console between the passenger and driver's seats. (Exh. 3 at 172.) Amanda could not recall any conversation among the three of them during the drive to Chester's. (Id.) Amanda had only enough money to buy herself a soda and Petitioner therefore, gave her enough money to buy two additional sodas. (Exh. 3 at 172-73.) She testified that Petitioner then asked E.B. what he was getting for buying her a soda, to which E.B. replied, a kiss. (Exh. 3 at 173.) Upset by E.B.'s response, Amanda exited the truck without

15

waiting to see if E.B. kissed Petitioner. (Exh. 3 at 174.) When she returned to the truck, E.B. told her that she had kissed Petitioner. (Id.) Amanda however, did not believe E.B., which caused her to kiss him again. (Exh. 3 at 176.) Amanda described the kiss as a passionate one. (Id.) While Petitioner and E.B. were kissing, Amanda testified that she asked: "Are you all going to do anything else, because I don't want to be in here if you do?" (Exh. 3 at 177.) She said that E.B. responded: "Well, I don't know." (Exh. 3 at 178.) Amanda therefore, exited the truck and eventually crouched down with her back against the passenger door. (Id.) At some point, Amanda testified that she stood up, looked through the passenger door window, and observed E.B.'s head in Petitioner's lap, moving up and down. (Exh. 3 at 178-79.) Amanda then crouched back down. (Exh. 3 at 180.) After waiting a few minutes, Amanda testified that she looked up through the passenger door mirror and saw that E.B.'s head remained in Petitioner's lap, but stated that she could not see Petitioner's penis. (Id.) She testified that she could not remember the windows of Petitioner's truck being tinted. (Id.) Amanda waited a minute or two longer, stood up, noticed E.B. was raising her head from Petitioner's lap, and got in the truck. (Id.) As the three of them were driving away from Chester's, Amanda testified that Petitioner said: "Let's just keep this between us" and Amanda and E.B. agreed. (Exh. 3 at 181.) Amanda further testified that afterward, she did not tell anyone what happened because she was scared. (Exh. 3 at 184-87.) When Heather asked her if it happened, Amanda testified that she lied to her sister and told her that it did not. (Exh. 3 at 184.) On cross-examination, Amanda testified that E.B. never told her that Petitioner forced her to perform oral sex, although Amanda thought that E.B. was telling others that he had forced her. (Exh. 3 at 201-03.) Amanda said that E.B. told her Petitioner "worded" her into doing it. (Id.)

On the second day of trial, the State called E.B. to testify. (Exh. 4 at 5-37.) E.B. testified that she was eleven years old as of March 1, 2001. (Exh. 4 at 5-7.) Contrary to Amanda's testimony, E.B.

testified that during the five minute drive to Chester's, Petitioner asked her and Amanda what he was getting for buying them sodas. (Exh. 4 at 17.) E.B. told Petitioner that she would give him a kiss. (Id.) Petitioner then asked her where, and E.B. responded that she would kiss him on the lips. (Exh. 4 at 18.) After Amanda exited the truck, E.B. testified that she "french kissed" Petitioner. (Exh. 4 at 18.) Because Amanda did not believe her, she testified that when Amanda returned to the truck she kissed him again. (Exh. 4 at 19.) When Amanda exited the truck again to get another soda, E.B. testified that Petitioner asked her whether she had ever given a "blow job." (Exh. 4 at 20.) E.B. responded that she had not. (Id.) She testified that Petitioner then asked her if she would like to give him a "blow job." (Id.) She responded that she did not want to, but Petitioner kept asking her, and finally, she "gave in." (Id.) E.B. testified however, that Petitioner did not force her. (Exh. 4 at 21.) E.B. further testified that she agreed to fellate Petitioner for only one minute and the she watched the clock on his dashboard while performing oral sex. (Exh. 4 at 22.) After a minute had passed, E.B. stopped, but Petitioner pushed her head back down and said: "No, keep going." (Id.) After another minute passed, E.B. testified that Petitioner "spermed" in her mouth, which she swallowed. (Exh. 4 at 23.) E.B. stated that she did not know what had happened until her mother explained to her at a later date, that Petitioner had ejaculated. (Exh. 4 at 23.) She thought he had urinated in her mouth. (Id.) Afterward, Amanda got back in the truck and asked if anything had happened and E.B. told her what she had done. (Exh. 4 at 25.) She testified that Amanda told her that her actions were nasty and refused to give her a drink of her soda. (Exh. 4 at 26.) Consistent with Amanda's testimony, E.B. testified on cross-examination that Petitioner's truck windows were not tinted. (Exh. 4 at 38.)

Heather Bowling was a key witness for the State. She testified that she heard rumors about what happened between Petitioner and E.B., but initially did not believe them. (Exh. 4 at 76.) Eventually however, Amanda told Heather what happened and she broke off her relationship with

17

Petitioner. (Exh. 4 at 78.) In late March, or early April, 2001, Heather testified that she ran into Petitioner at the bowling alley and agreed to take a ride with him so that they could talk. (Exh. 4 at 80-82.) She asked Petitioner what happened and Petitioner, at first, denied that anything had happened. (Exh. 4 at 82.) Heather then told Petitioner that Amanda would not have told her what she did if it was not true, and Petitioner admitted that "it happened." (Id.) Petitioner drove Heather back to the bowling alley and they never again discussed the incident. (Exh. 4 at 84.) Heather testified that she never told anyone about Petitioner's confession until she received a subpoena from Mr. Burnette, Petitioner's attorney. (Exh. 4 at 87.) Heather said that she then told her mother and Mr. Burnette that Petitioner had confessed to her. (Id.) Although Mr. Burnette decided not to call Heather as a witness, she subsequently received a subpoena from the State. (Exh. 4 at 91.) Heather testified however, that she did not know how Mr. Dolly, the Assistant Prosecuting Attorney for Greenbrier County, found out about the confession. (Exh. 4 at 92.)

The State's final witness was West Virginia State Trooper Jeff Cooper, who testified that he took statements from Amanda and E.B. and ran a Department of Motor Vehicles check on Petitioner, which confirmed his birthdate of February 15, 1979. (Exh. 4 at 117-20.)

At the close of the prosecution's case in chief, defense counsel moved for the entry of judgment of acquittal, which motion was denied by the trial court. (Exh. 4 at 121-23.) The defense first presented the testimony of John D. Johns, Private Investigator, who played a video portraying the drive from 40 Oaks to Chester's. (Exh. 4 at 124-42.)

The defense next called A.Y., a twelve-year-old girl who lived in trailer park at 40 Oaks. A.Y. testified that E.B. initially told her that Petitioner had forced her to perform oral sex. (Exh. 4 at 154.) She further testified that she recalled E.B. also telling her that the incident never happened. (Exh. 4 at 154-57.) A.Y. testified that E.B. had a reputation of lying and thought that because E.B. was not

18

upset about the incident, she must have fabricated it. (Exh. 4 at 170-71.) Amanda further testified that Petitioner, Amanda, and E.B. were gone nearly thirty minutes to Chester's, but stated that her soda was cold when Amanda brought it to her. (Exh. 4 at 177.)

The defense further called Petitioner's mother, Nancy June McClung Sizemore who testified that she and her husband asked Heather to testify on Petitioner's behalf, but that she refused because her family would not permit it. (Exh. 4 at 178-82.) E.B.'s mother, Pam Sawyers, testified that E.B. initially told her that Petitioner forced her to perform oral sex and that was how the incident was reported to the State Police. (Exh. 4 at 186-91.) Jessica Rudd Kinkaid, Petitioner's ex-girlfriend, testified that E.B. initially told her that she performed oral sex on Petitioner, but later stated that Petitioner had forced her to do it. (Exh. 4 at 200.) Ms. Kinkaid stated that E.B. ultimately told her that the incident never happened. (Id.) On cross-examination, Ms. Kinkaid denied ever performing oral sex on Petitioner in her trailer while E.B. watched her baby. (Exh. 4 at 211.)

On the third, and final day of trial, Petitioner testified in his own defense. He testified that he tinted the windows in his truck the previous winter. (Exh. 5 at 25-28.) He further testified that due to the distance between the seat and steering wheel that it was physically impossible for someone to perform oral sex on someone seated in the driver's seat, while watching the clock, which was positioned nearly a foot and a half to the right of the driver's seat. (Exh. 5 at 30.) Petitioner admitted that he drove Amanda and E.B. to Chester's on March 1, 2001, and that the drive was approximately two minutes each way. (Exh. 5 at 33.) After Amanda got out of his truck, he testified that for some reason, E.B. leaned over and kissed him and then asked whether he liked her. (Exh. 5 at 33-34.) While Amanda bought the sodas, he testified that E.B. sat in the passenger said and never said a word. (Exh. 5 at 34.) The entire trip lasted five to ten minutes. (Exh. 5 at 35.) Petitioner testified that he never confessed anything to Heather and would not have because he had not known her very long.

19

(Exh. 5 at 37-38.) He further testified that when questioned about the incident by Trooper Cooper, he advised that he wanted to speak with his attorney first. (Exh. 5 at 39.) He never gave a formal statement to Trooper Cooper. (Id.)

On cross-examination, the State established that Petitioner's birthday was February 15, 1979. (Exh. 5 at 42.) He testified that he knew E.B.'s age, or at least, about how old she was. (Exh. 5 at 43.) The State questioned Petitioner about his prior relationship with Ms. Kinkaid and asked whether he ever went to her trailer and requested oral sex, in E.B.'s presence, to which he responded in the negative. (Exh. 5 at 67-68.)

Finally, the defense called Ms. Kinkaid's father, Andrew Troy Rudd, and Charles "Rusty" Hatcher, the father of a friend of Petitioner's, as character witnesses. (Exh. 5 at 72-77, 112-17.) Petitioner renewed his Motion for Judgment of Acquittal, which motion was denied. (Exh. 5 at 119-20.)

The State called Heather Bowling and Heather Whisman as rebuttal witnesses. Heather testified that Petitioner did not tint his windows until after they broke up, in mid-March, 2001. (Exh. 5 at 122-23.) Ms. Whisman, the wife of Petitioner's friend Jeff, testified that Petitioner was not a very trustworthy and truthful person. (Exh. 5 at 130-35.) She stated that she would not trust her three year old daughter with Petitioner. (Exh. 5 at 133.) The defense called Dan Sizemore, Petitioner's step-brother, as a rebuttal witness. He testified that Petitioner tinted the windows of his truck in January, 2001. (Exh. 5 at 140-41.) He remembered that it was flurrying when he was tinting the windows and that he told Petitioner that it was too cold for the tint to adhere to the windows. (Id.) Mr. Sizemore stated however, that the tint was tight and complete. (Id.) After deliberating for approximately four hours, the jury returned a guilty verdict.

Evidentiary and sentencing hearings were held on December 2, 2002 (Exh. 6.), and March

24, 2003, during which defense counsel presented testimony and vouched the record as it pertained to Petitioner's Motions for New Trial.

## ANALYSIS

### I.    The Sanctity of the Jury.

Petitioner alleges that the sanctity of the jury was violated when (1) the bailiff reported the jury's deliberations to the parties (Doc. No. 2 at 5-7.), (2) at least one member of the jury conducted an unauthorized experiment (Id. at 7-14.), (3) one juror exchanged hand signals with a member of the Family Refuge Center (Id. at 14-19.), (4) the trial court placed undue pressure on the minority members of the jury by not instructing the jury of their right to adjourn (Id. at 19.), (5) one juror made a telephone call to a third party in violation of the trial court's sequestration order (Id. at 19-22.), and (6) one of the jurors was permitted to remain on the jury despite his relation to a State witness. (Id. at 22-24.)

The Sixth Amendment provides "that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI.; see also Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."). The standard for evaluating a claim of extraneous jury contact was set forth in Remmer v. United States, 347 U.S. 227, 299, 74 S.Ct. 450, 451, 98 L.Ed.2d 654 (1954). Pursuant to the holding in Remmer, a petitioner is entitled to a presumption of prejudice upon a showing of "any private communication, contact, or tampering directly or indirectly with a juror during a trial about the matter pending before the jury." Remmer, 347 U.S. at 229, 74 S.Ct. at 451. The burden of rebutting this presumption "rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." Id. In Haley v. Blue Ridge

21

Transfer Co., 802 F.2d 1532, 1535 (4th Cir. 1986), the Court established a three-step process for analyzing allegations of extrajudicial juror contact. First, the petitioner must demonstrate by competent evidence that there was an extrajudicial communication, contact, or tampering, which was more than innocuous. Haley, 802 F.2d at 1536-37. Second, if the petitioner satisfies this burden, then the Remmer presumption applies. Id. Third, the burden then shifts to the respondent to demonstrate that there was no reasonable probability that the jury was influenced by an improper communication, contact, or tampering. Id. The undersigned will analyze each of Petitioner's claims under this analytical framework.

    **A.  Bailiff's report of jury's deliberations.**

    Petitioner first alleges that his Sixth Amendment right to a fair trial by an impartial jury was violated when the bailiff eavesdropped on the jury's deliberations and reported to the parties the vote count and that the women jurors were "holding out for an acquittal." (Doc. No. 2 at 5; Doc. No. 13 at 5.) Citing Remmer, Petitioner avers that the bailiff's actions constituted an unauthorized invasion of the integrity of the jury by violating their right to deliberate in secret and without fear that their discussions would be reported to the court. (Id. at 6.) He states that the effect of the bailiff's conduct on the jury is unknown because W.Va. R. Evid. 606 prohibited him from inquiring of such of the jurors. (Id.) Petitioner speculates that the bailiff's conduct in general could create multiple dangers, such as affecting plea negotiations and causing jurors to go against the majority in fear of being publicly ridiculed. (Id. at 6-7.)

    In his Motion, Respondent argues that Petitioner has not alleged that the bailiff's conduct "exposed the jury to prejudicial, extraneous information, or that he improperly communicated with them during deliberations." (Doc. No. 8 at 28-29.) Rather, Petitioner "is more concerned with the jury's right to deliberate in secret." (Id. at 28.)  Respondent argues that Remmer is not dispositive in

this matter because Petitioner has neither produced evidence that the bailiff "actually communicated, contacted or tampered with the jury," or that the jury was influenced by the bailiff's conduct. (Id. at 29-30.) Respondent further argues that the list of possible dangers enumerated by Petitioner were not present in this case, and therefore, Petitioner's speculations "are patently frivolous." (Id. at 30-31.)

In his Reply, Petitioner avers that pursuant to the holding in Remmer, he has demonstrated that the bailiff's conduct was an unauthorized contact with the jury which shifted the burden to the Respondent to show that the bailiff's conduct did not prejudice Petitioner. (Id. at 5-6.) He contends that the Respondent did not satisfy this burden. (Id. at 6.) In his Reply, Respondent argues that Petitioner has not met his burden of proving that the bailiff actually contacted the jurors during their deliberations, and therefore, the Remmer presumption does not apply. (Doc. No. 14 at 7.)

The undersigned finds that Petitioner has not met his initial burden under Remmer of demonstrating by competent evidence that the bailiff engaged in private communication or contact with the jury, or otherwise tampered with the jury. The evidence of record indicates that the bailiff listened to the jury's deliberations, apparently through either a thin wall or door, and then reported to the parties the substance of the jury's deliberations, which included a tally of the votes and how the jurors voted. (Doc. No. 2 at 5-7; Exh. 6 at 10-14, 64-69.) Petitioner has not proven that the bailiff actually spoke with, contacted, or otherwise made his appearance and listening known to the jury. Without commenting on the propriety of the bailiff's conduct, it is apparent that he had no extrajudicial contact with the jury which the Remmer holding is designed to protect. Accordingly, the undersigned finds that Petitioner's evidence is insufficient to establish the fact of an improper communication, contact, or tampering with the jury to raise the presumption of prejudice under Remmer. The Respondent's Motion for Summary Judgment should be granted with respect to this issue.

**B.  The jury conducted an unauthorized experiment.**

Petitioner next alleges that the sanctity of the jury was violated when at least one of the jurors conducted an unauthorized experiment and reported his conclusions to the other jurors. (Doc. No. 2 at 7-14.) Petitioner avers that he learned post-trial, that Juror Massey, who had a truck similar to Petitioner's, conducted a private experiment and determined that the State's witness, Amanda, could not have observed E.B. fellating Petitioner through the truck's side mirror while Amanda was crouched against the side of the truck. (Id. at 8.) He further avers that Juror Massey conveyed this information to other jurors which resulted in the jury disregarding Amanda's testimony with respect to her observation. (Id.) Petitioner therefore contends that a new trial is required unless Respondent can prove beyond a reasonable doubt that the juror's experiment did not affect the reasoning of any juror. (Id. at 8-9.) Petitioner further contends that the juror's experiment (1) did not constitute reliable scientific evidence under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), (2) did not satisfy his confrontation rights under the Sixth Amendment and Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and (3) indicated that at least one juror violated the trial court's instructions. (Id. at 9-10.) Petitioner avers, however, that the affect of the experiment on the jury is unknown because he was prohibited from questioning the jury pursuant to W.Va. R. Evid. 606. (Id. at 11.)

In his Motion, Respondent argues that under the harmless error standard of review, Petitioner has failed to prove that he was prejudiced by the alleged juror's experiment. (Doc. No. 8 at 33-34.) Additionally, Respondent argues that Juror Massey's conduct did not constitute an experiment. (Id. at 33.) Rather, Juror Massey's observation that he could not see the interior of the truck while crouched beside it, constituted nothing more than a verification of his personal experience and observation. (Id.) However, to the extent that Juror Massey introduced prejudicial, extraneous

24

information to the jury, Respondent avers that there was no "substantial or injurious effect" on the jury's verdict. (Id. at 34.) Respondent argues that it is most likely that the juror's experiment "undermined Amanda's credibility." (Id.) Additionally, Amanda's testimony as to what she observed through the truck's side mirror was cumulative of what she observed through the passenger door window. (Id.) Nevertheless, Respondent argues that the trial court found the State's evidence against Petitioner "overwhelming." (Id. at 36.) Regardless of the experiment, Petitioner failed to establish E.B.'s motive to lie and therefore, "the jury's credibility decision was an easy one." (Id. at 34-36.)

Petitioner argues in his Reply that "[a]n experiment is a verification of a juror[']s own experience and is forbidden. . . . because it makes the juror a witness who is beyond cross examination." (Doc. No. 13 at 7.)

In addition to the guarantee of an impartial jury, the Sixth Amendment also provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The undersigned finds, as Petitioner alleges, that his claim that a juror conducted an improper experiment is strongly intertwined with his right to confrontation. Because the Respondent has not addressed this aspect of Petitioner's claim, the undersigned finds that Respondent's Motion should be denied and that Respondent be directed to address fully all aspects of Petitioner's claim.

### C.  Juror's hand signals with a member of the Family Refuge Center.

Petitioner next alleges that Juror Mooney improperly communicated with Kathy Ewing, an employee of the Family Refuge Center [FRC]. (Doc. No. 2 at 14-19.) He alleges that because funding for the Prosecuting Attorney's Office is supervised by the FRC, the Remmer presumption applies and the Respondent is required to show that the juror's conduct was not prejudicial. (Id. at  15-16.) Respondent argues that Petitioner failed to develop the factual basis for his claim at the State level,

25

and therefore, has not demonstrated the existence of concrete evidence of bias such as would invoke the <u>Remmer</u> presumption. (Doc. No. 8 at 36-39.) Respondent avers that mere contact with a member of the FRC is not presumptively prejudicial. (<u>Id.</u> at 38.) Respondent further argues that the FRC neither supervises, nor administers funding for the Prosecuting Attorney's Office. (<u>Id.</u> at 38-39.) Although the Executive Director of the FRC is on the West Virginia Against Violence Committee, which decides how grant money from the West Virginia Division of Criminal Justice is allocated, the FRC itself, "plays no role in the allocation of these funds." (<u>Id.</u> at 39.)

The evidence reveals that during his post-trial evidentiary hearing, Petitioner's half-brother, Van Sizemore, testified that he observed Juror Mooney wink at Ms. Ewing as he left the jury room for lunch, wave to her from his car, and give her the thumbs up signal while driving from the courthouse after the second day of trial. (Exh. 6 at 52-53.) Van Sizemore testified that he told defense counsel of Juror Mooney's conduct, but Mr. Burnette responded:

> "I can't get rid of that juror because he is one of my strongest jurors I feel because I met him at a function", or he said, "He met me at a function", and he winked at me and shook my hand and he said, "I just can't get rid of him."

(Exh. 6 at 52.) With the exception of Van Sizemore, Petitioner failed to call any witnesses to develop the factual basis for his claim. The trial court found that the evidence indicated that Juror Mooney "was friendly with both sides" and did not demonstrate any improper communication which tainted Petitioner's criminal trial. (<u>Id.</u> at 134-35.) The undersigned agrees and finds that Petitioner has not demonstrated that Juror Mooney's conduct constituted improper third party communication which invokes the <u>Remmer</u> presumption of prejudice.  Petitioner had the opportunity to develop the factual basis of his claim at the State level by calling witnesses such as Juror Mooney, Ms. Ewing, and his trial attorney, but failed to do so. Ms. Ewing's status with the FRC, standing alone, is insufficient to establish prejudice. Without more, the undersigned finds that Petitioner's claim is without merit.

Pursuant to 28 U.S.C. § 2254(e)(2), Petitioner's failure to develop the factual basis for his claim in the State courts precludes him from developing the claim in an evidentiary hearing on federal *habeas* review. Accordingly, Respondent's Motion should be granted with respect to this ground for relief.

### D. Undue Pressure on Minority Jurors.

Petitioner alleges that on the last day of trial, the court placed undue pressure on the minority members of the jury by requiring that they deliberate into the night without instructing them that they could adjourn and reconvene the following day. (Doc. No. 2 at 19.)  In his Motion, Respondent argues that Petitioner's claim lacks any factual basis. (Doc. No. 8 at 45.)

The undersigned agrees with Respondent and finds that the record does not support Petitioner's claim that the trial court placed undue pressure on the minority members. As Respondent notes, on the last day of trial, the trial court, prior to the lunch recess, advised the jury:

> I would have you come back at 1:15, but I'm fearful that that's not enough time to get lunch. At the same time, I'm mindful of the fact we're in the third day, so. Well, just to be on the safe side, please return to the jury room no later than 1:30. That will give you about an hour and fifteen minutes for lunch and I'm hopeful that we can conclude this today, but if we can't, we can't, but we'll make every effort. And if there's anything that any of you have that is personal with time wise, bring it to my attention. I'm already aware of one of the jurors schedule for tomorrow, so, we'll make every effort if we can to conclude this today.

(Exh. 5 at 117-18.) Although the jury began deliberations at 3:50 p.m., taking one half hour break at 6:00 p.m., the jury rendered its verdict at 8:50 p.m., without any of the jurors requesting they adjourn for the evening. (Exh. 2 at 166.) Petitioner, however, has not demonstrated that the "majority simply refuse[d] to adjourn until the minority capitulate[d]." In the absence of factual support, the undersigned finds that Petitioner's claim is unavailing and that Respondent's Motion should be granted.

### E. Juror's telephone call to third party.

27

Petitioner further alleges that during the evening break in deliberations, Juror Kelly Green violated the trial court's sequestration order when she telephoned a third party. (Doc. No. 2 at 20-22.) Petitioner states that during a post-trial evidentiary hearing, defense counsel proffered that Petitioner's step-brother, Van Sizemore, would have testified that he overhead Juror Green talking on her cell phone, advising the caller on the other end that she was under pressure, and stating that she did not know what do. (Id. at 22-22.) Petitioner avers that the telephone call was made during the evening half hour break and that "[n]ot longer after[,] she changed her vote to go with the majority to convict Alex Sizemore." (Id. at 21.) During the hearing, however, the trial court refused to admit Van Sizemore's evidence, pursuant to W.Va. R. Evid. 606(b).[2]

In his Motion, Respondent argues that Petitioner is alleging a violation of state law and procedure which is not cognizable on federal *habeas* review. (Doc. No. 8 at 40-41.) To the extent Petitioner's claim is cognizable, however, Respondent argues that Petitioner "has no federal constitutional right to a fully sequestered jury." (Id.) Respondent further argues that Petitioner's claim lacks factual support. (Id.) Contrary to Petitioner's claim, Respondent avers that the trial court prohibited the jurors from discussing the facts of the case during the breaks, not from talking with

---

[2] W.Va. R. Evid. 606(b) provides:

(b) **Inquiry Into Validity of Verdict or Indictment**. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

third parties altogether. (Id. at 41.) During the evidentiary hearing, the trial court did not prohibit defense counsel from introducing "evidence of prejudicial, extraneous influences on Juror Green." (Id.) Rather, under W. Va. R. Evid. 606(b), the court prohibited Petitioner "from introducing evidence relating to Juror Green's frame of mind during deliberations." (Id.)

The undersigned finds that Petitioner has alleged a violation of State law and procedure and that he has not demonstrated that the trial court's ruling with respect thereto denied him a fundamentally fair trial. To the extent that Petitioner's claim relies upon state law and challenges the state court's evidentiary rulings, therefore, Respondent is entitled to summary judgment. See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). The trial court initially instructed the jury that they were "forbidden to discuss this case with anyone until the trial has been completed to the stage that the jury . . . retires to its room to deliberate upon a verdict." (Exh. 3 at 111.) Although Petitioner contends that Van Sizemore overheard Juror Green state that she felt pressured and did not know what to do, he was unable to present evidence that she received an extraneous communication. Defense counsel even called Juror Green as a witness, but failed to make any inquiry with respect to the telephone call. (Exh. 6 at 57-58.) Pursuant to 28 U.S.C. § 2254(e)(2), the undersigned further finds that Petitioner is not entitled to an evidentiary hearing on this claim. Respondent's Motion should be granted with respect to this claim.

### F.  **Juror related to State witness**.

Petitioner also alleges that the trial court improperly impaneled a juror related to a defense witness who had previously accused this juror's cousin of sexual improprieties similar to the charges

against Petitioner. (Doc. No. 2 at 22-24.) Respondent argues that the Court cannot infer constitutional prejudice based solely upon the familial relationship. (Doc. No. 8 at 44.) Respondent further argues that Petitioner has not demonstrated prejudice from defense counsel's failure to strike the juror, and therefore, has not proven that counsel was ineffective. (Id. at 44-45.)

During trial, defense counsel called A.Y., who testified that E.B. fabricated the entire incident with respect to Petitioner. (Exh. 4 at 151-77.) During Petitioner's post-trial evidentiary hearing, L.S. testified that E.B. had falsely accused A.Y.'s father, Brian Yates, of sexual improprieties. (Exh. 7 at 5-15.) Brian Yates's cousin, Donnie Yates, was selected to serve as a juror in Petitioner's criminal trial. (Exh. 3 at 99-100.) After he was impaneled, but before the trial began, Donnie Yates passed a note to the bailiff, which stated: "Sir, if the Yates girl's father's name is Brian, then he is a first cousin." (Id. at 102.) Both the Court and the prosecuting attorney questioned Juror Yates as follows:

| | |
|---|---|
| The Court: | Mr. Yates, would you come over here and have a seat there in front of the jury box, please, sir. I believe you had started to say something to Mr. Dolly as we recessed from the morning session, correct? |
| Juror Yates: | Yes, sir. |
| The Court: | And I - - you may have tried to speak to somebody again and the court Bailiff said you couldn't do that, correct? |
| Juror Yates: | Right. |
| The Court: | And you wrote this note? |
| Juror Yates: | Yes, sir. |
| The Court: | You recall that if the Yates girl's father's name is Brian, then he is a first cousin, is that correct? |
| Juror Yates: | If that's hers, I don't know. |
| The Court: | So, you have a first cousin by the name of Brian Yates, correct? |
| Juror Yates: | Right. |
| The Court: | Do you know his family? |
| Juror Yates: | His dad is my dad's brother. So, he's my uncle. |
| The Court: | Okay. But do you know Brian Yates' family? |
| Juror Yates: | No, I do not. |
| The Court: | Do you know if he has any children? |
| Juror Yates: | I have no idea. |
| The Court: | So, you're not close at all? |
| Juror Yates: | No, not really. |
| The Court: | Okay. Mr. Dolly, any questions to Mr. Yates? |

| | |
|---|---|
| Mr. Dolly: | Yes, Your Honor. Mr. Yates, I believe that Amanda's father is Brian. |
| Juror Yates: | Okay. |
| Mr. Dolly: | So, she would be a relative. Is that going to - - now, let's assume that she testifies. Is the fact that her daddy and you are first cousins going to make any difference to you? |
| Juror Yates: | No, sir. |
| Mr. Dolly: | Would you give her testimony any more weight or any less weight because she's a blood relative of yours? |
| Juror Yates: | No, sir. |
| Mr. Dolly: | You going to hold it - - are you going to be more favorable to the side that calls her or doesn't call her or cross-examine her? |
| Juror Yates: | No. |
| Mr. Dolly: | Not going to make any difference to you? |
| Juror Yates: | No, sir. |
| Mr. Dolly: | You'll listen to her just the same as everybody else and then decide - - |
| Juror Yates: | That's correct. I just wanted to set it straight and I didn't know - - I don't know them, really. |
| Mr. Dolly: | I appreciate that and I'm satisfied with the juror's answers. |
| The Court: | Thank you. Mr. Burnette, any questions? |
| Mr. Burnette: | No, Your Honor. That's fine with us. |

(Exh. 3 at 103-05.)

Based on the foregoing, the undersigned finds that the trial court and counsel properly considered through voir dire the possible biases that Juror Yates may have possessed in view of his relationship to one of the defense witnesses. However, Juror Yates stated that he did not know the witness or her family and that his relation to her, would not affect his judgment. The undersigned therefore, further finds that Petitioner has not demonstrated that Juror Yates was biased, and consequently, counsel was not ineffective in failing to strike him from the jury.

## II.   Violation of Brady v. Maryland.

Petitioner alleges that E.B. falsely accused other men of sexual improprieties and that the evidence of her allegations was properly admissible as impeachment evidence under an exception to the West Virginia Rape Shield Statute, W.Va. Code § 61-8B-11. (Doc. No. 2 at 25-28.) He cites five examples of false allegations, which he considers as Brady material, and asserts that he was

unable to develop the evidence for three reasons: 1) It was withheld by the State, 2) the Court barred the development of the evidence due to a misapplication of the Rape Shield Statute, and 3) defense counsel was surprised and did not recognize the pattern when presented. (Doc. No. 2 at 26.)

It is well established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). Evidence is considered material if "its suppression undermines confidence in the outcome of the trial." United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985); see also Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 1558, 131 L.Ed.2d 490 (1995)(stating that evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.")(citations omitted). In United States v. Agurs, 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976), the Supreme Court clarified the prosecutor's duty to require disclosure of favorable evidence to the defense, even if not requested. This duty encompasses impeachment evidence, exculpatory evidence, and evidence "known only to police investigators and not to the prosecutor." Kyles v. Whitley, 514 U.S. 419, 438, 115 S.Ct. 1555, 1567-68, 131 L.Ed.2d 490 (1995). However, a prosecutor does not have a "constitutional duty routinely to deliver his entire file to defense counsel." United States v. Agurs, 427 U.S. at 111, 96 S.Ct. at 2401. If the prosecution suppresses Brady material, the disclosure of which would have in all reasonable probability resulted in a different outcome, then the mandates of due process are violated. See Bagley, 473 U.S. at 667, 105 S.Ct. at 3375; Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. at 1196-97. To state a valid Brady claim therefore, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching, [the] evidence must have been suppressed by the State, either willfully or

inadvertently," and the evidence must have been material to the verdict such that its suppression prejudiced the defense. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); Monroe v. Angelone, 323 F.3d 286, 299-300 (4th Cir. 2003). "[W]hen the claim is one of delayed disclosure rather than complete suppression . . . [the Court] need not reach the question whether the evidence at issue was 'material' under Brady unless the defendant first can show that defense counsel was 'prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case.'" United States v. Lemmerer, 277 F.3d 579, 588 (1st Cir.), cert. denied, 537 U.S. 901, 123 S.Ct. 217, 154 L.Ed.2d 173 (2002)(quoting United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986)).

> The "principal concern" in such cases is "whether the failure to supply the information in a seasonable fashion caused the defense to change its trial strategy." *United States v. Joselyn*, 99 F.3d 1182, 1196 (1st Cir. 1996). Thus, the defendant must show that "learning the information altered the subsequent defense strategy and [that], given timeous disclosure, a more effective strategy would likely have resulted." *United States v. Devin*, 918 F.2d 290 (1st Cir. 1990). He cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a prima facie showing of a plausible strategic option which the delay foreclosed." *Id.*

Lemmerer, 277 F.3d at 588.

### A.     E.B.'s Recorded Statement to Trooper Cooper.

Petitioner first alleges that during discovery, the State provided him a recorded statement from E.B. to Trooper Cooper, which contained a false allegation concerning Petitioner. (Doc. No. 2 at 26.) In her statement, E.B. stated that during the drive to Chester's, Amanda commented on the size of Petitioner's "private part" and that Petitioner then asked whether Amanda and E.B. wanted to see his "private part." (Id.) Petitioner contends that because Amanda testified at trial that there was no conversation during the drive to Chester's, E.B.'s statement was false. (Id.) Respondent argues that the statement does not constitute Brady material because it was disclosed to the defense by the State

33

prior to trial. (Doc. No. 8 at 49.) The undersigned agrees with Respondent and finds that E.B.'s recorded statement was not suppressed by the State; Petitioner concedes that the statement was disclosed during discovery. Accordingly, Petitioner has failed to establish the second element of a Brady violation and his claim must be dismissed.

      **B.**      **E.B.'s Statement Alleging Additional Sexual Misconduct by Petitioner.**

Second, Petitioner alleges that the State withheld a statement given to them by E.B. only days prior to trial alleging additional sexual misconduct by Petitioner. (Doc. No. 2 at 26-27.) On the second day of trial, during the direct examination of E.B., the State attempted to elicit testimony regarding an incident in which Petitioner entered the residence of Jessica Rudd Kinkaid, where E.B. and Ms. Kinkaid were present, and asked who was going to provide him oral sex. (Doc. No. 9, Exh. 4 at 32; Doc. No. 10, Exh. 8 at 7.) Defense counsel objected, claiming that the substance of E.B.'s statement was not disclosed to him prior to trial, and that the statement constituted impermissible character evidence. (Id.) The State Prosecutor averred that the statement was provided to him two days ago, conceded that the substance of the statement had not been disclosed to Petitioner before trial, and stated that he would avoid it. (Exh. 8 at 7.) Although the State did not further pursue this line of questioning with E.B. (Exh. 4 at 33-37.), during cross-examination of Petitioner on the third day of trial, the State Prosecutor asked whether he recalled entering Ms. Kinkaid's residence and asking: "Who is going to give me a blow job?", to which Petitioner responded: "No." (Exh. 5 at 67.)

Respondent argues that although Petitioner alleges that the statement was provably false, its exculpatory nature was dependent upon Petitioner's credibility. (Doc. No. 8 at 49.) Thus, "Petitioner's mere denial is insufficient as a matter of law to prove that the victim's statement was a prior false allegation." (Doc. No. 8 at 50.) Respondent notes, however, that Ms. Kinkaid also denied the validity of the statement. (Doc. No. 8 at 50; Exh. 4 at 211.) To the extent the statement is

considered <u>Brady</u> material, Respondent argues that Petitioner cannot demonstrate that he was denied the opportunity to impeach E.B.'s credibility because of the delayed disclosure or non-disclosure of the statement. (Doc. No. 8 at 50.) Because Ms. Kinkaid testified after E.B. and Petitioner, defense counsel was able to attack E.B.'s credibility through Ms. Kinkaid's rebuttal testimony. (Doc. No. 8 at 50.)

Petitioner's claim is an issue of delayed disclosure, and therefore, the Court need not determine whether the evidence was material. <u>Lemmerer</u>, 277 F.3d at 588. "When determining the constitutional validity of a belated *Brady* disclosure, the relevant inquiry is whether the defendant was able to effectively use the exculpatory information." <u>United States v. Smith Grading and Paving, Inc.</u>, 760 F.2d 527, 532 n. 6 (4th Cir.), <u>cert. denied sub nom</u> <u>Dellinger, Inc. v. United States</u>, 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985). Petitioner became aware of the particular evidence on the second day of trial during the direction examination of the State's first witness. Because defense counsel was aware of this information prior to Petitioner's and Ms. Kinkaid's testimony, the undersigned finds that the delayed disclosure, at trial, did not prevent him from effectively using the information at trial. Accordingly, the delayed disclosure does not rise to the level of a constitutional violation.

Respondent further argues that to the extent Petitioner alleges that E.B's statement constituted inadmissible character evidence under W.Va. R. Evid. 404(b), Petitioner fails to demonstrate how its admission denied him a fundamentally fair trial; the State's questions were fair responses to Ms. Kinkaid's testimony that she had no feelings for Petitioner. (Doc. No. 8 at 50-52.) Pursuant to W.Va. R. Evid. 611, the State was permitted to expose Petitioner's potential biases on cross-examination. (Doc. No. 8 at 52.) Citing <u>State v. Edward Charles L.</u>, 183 W.Va. 641, 651, 398 S.E.2d 123, 133 (1990), Respondent further argues that evidence of similar bad acts is generally admissible in child

sexual assault and abuse cases to show lustful disposition. (Doc. No. 8 at 52.)

Relief under 28 U.S.C. § 2254 is available to state prisoners in "custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254 (2002). Violations of state law and procedure that do not implicate specific federal constitutional provisions are not cognizable in *habeas* review. See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); Fisher v. Angelone, 163 F.3d 835, 854 (4th Cir. 1998), cert. denied, 526 U.S. 1035, 119 S.Ct. 1290, 143 L.Ed.2d 382 (1999). Generally, federal *habeas* relief is available with respect to a trial court's evidentiary rulings, only if the ruling denied the defendant the right to a fair trial. See Abrams v. Barnett, 121 F.3d 1036, 1042 (7th Cir. 1997). When the challenged evidentiary rulings "so infected the entire trial that the resulting conviction violates due process," it is presumed that the defendant was denied a fair trial. Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). The fact that the admitted evidence allegedly was improper under state law, however, does not provide a basis for *habeas* relief. "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983). The proper inquiry for the Court is whether the admission of the evidence itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72, 112 S.Ct. at 482.

Based on the foregoing, the undersigned finds Petitioner's claim unavailing. He has not demonstrated that the trial court's admission of the evidence of additional sexual misconduct denied him a fundamentally fair trial. As Respondent argues, the State was permitted to introduce such

evidence under W.Va. R. Evid. 611 and pursuant to state case law.[3] Ms. Kinkaid testified on the second day of trial that her relationship with Petitioner ended in July, 1999, and that at the time of trial, she possessed no romantic feelings for him.(Exh. 4 at 196, 201.) The State's use of the additional evidence on cross-examination was reasonably designed to expose any potential bias Ms. Kinkaid may have had. Similarly, because the alleged incident occurred shortly after the offense of conviction and because it was alleged that E.B. was present in the room when Petitioner asked who was going to perform oral sex on him, the evidence could have been admitted to demonstrate that Petitioner possessed a lustful disposition toward E.B. See State v. Charles Edward L., 183 W.Va. at 651, 398 S.Ed. at 133. Accordingly, Petitioner has failed to demonstrate that the delayed disclosure of the statement rendered his trial fundamentally unfair and his claim must be dismissed.

###   C.   L.S.'s Post-Trial Statement.

Petitioner's next example of a false allegation arises from the testimony of L.S. who testified on March 24, 2003, during a post-trial evidentiary hearing on Petitioner's Motion for New Trial. (Doc. No. 2 at 28.) The substance of L.S.'s testimony indicated that in her presence, E.B. asked Brian Yates for money to buy cigarettes. (Doc. No. 2 at 28; Exh. 7 at 11.) Brian Yates refused to give E.B. any money and E.B. left, only to return with her mother who told Mr. Yates: "Don't you never lay

---

[3] Rule 611(b) provides:

(b) Scope of Cross-Examination.

(1) *Party Witness*. A party may be cross-examined on any matter relevant to any issue in the case, including credibility. In the interest of justice, the judge may limit cross-examination with respect to matters not testified to on direct examination.

(2) *Non-Party Witnesses*. Cross examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the non-party witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

another hand on my daughter again." (Id.) Mr. Yates denied touching E.B. and threw the money at her. (Id.) Petitioner admits that the statement "is not a sexual allegation per say, [but avers that] laying a hand on a girl does have its sexual overtones." (Doc. No. 2 at 30.) Respondent argues that Petitioner has neither demonstrated that L.S.'s statement was suppressed before trial by the State, nor that the statement was material or exculpatory. (Doc. No. 8 at 53.)

The undersigned finds Petitioner's claim unavailing and agrees with Respondent. Petitioner has not proven that the State withheld this information from him prior to trial. Additionally, L.S.'s statement does not necessarily reference sexual conduct, the disclosure of which would have changed the outcome of his trial. Accordingly, Petitioner's claim does not rise to the level of a constitutional violation.

### D.    Ms. Kinkaid's Post-Trial Statement.

Petitioner's fourth example of a false allegation concerns Ms. Kinkaid's testimony on March 24, 2003, during a post-trial evidentiary hearing on Petitioner's Motion for New Trial. (Doc. No. 2 at 28.) When asked whether she was aware that E.B. had ever accused Brian Yates of any sexual improprieties, Ms. Kinkaid stated that she had heard such accusations from Mr. Yates's daughter. (Exh. 7 at 17-18.) Respondent does not specifically address this issue in his Response. The undersigned finds that as with the previous claim, Petitioner has neither alleged any facts to demonstrate that the State withheld this information, nor that the information was material such that it would have changed the outcome of his criminal trial. Accordingly, the undersigned finds this claim without merit and should be dismissed.

### E.    E.B.'s Records From the FRC and W.Va. DHHR.

Finally, Petitioner alleges that the State withheld from defense counsel E.B.'s records from the FRC and the West Virginia Department of Health and Human Resources [DHHR], involving

38

alleged sexual activity with E.B. from other sources. (Doc. No. 2 at 28-30.)

Prior to trial, Petitioner filed a Motion in Limine requesting that the trial court rule that the contents of E.B.'s confidential counseling records be admissible at trial and direct that the FRC and DHHR provide him copies of the records prior to the commencement of trial. (Exh. 23.) Petitioner alleged in his Motion that E.B. had been sexually abused prior to the alleged incident with him, and that these documents would demonstrate that E.B. had an alternate source of knowledge of sexually explicit terms, such as "blow job." (Id.) The trial court denied Petitioner's Motion, but ordered that the FRC and DHHR produce the records to the Court, under seal, for *in camera* review. After reviewing the documents, the trial court ruled that defense counsel could inquire as to whether E.B.'s description of the sexual conduct in which she engaged with Petitioner was the result of collusion or coaching by a third party. (Exh. 3 at 134.) The trial court prohibited defense counsel from inquiring as to whether E.B.'s knowledge resulted from prior acts of sexual conduct. (Exh. 3 at 134.) The trial court did not find that E.B.'s counseling records suggested that she had suffered prior sexual abuse. (Exh. 3 at 46.) At the *in camera* hearing, E.B. testified that she first heard the term "blow job" from her brothers, and knew what it meant prior to the incident in question. (Exh. 3 at 120-21.) She further testified, however, that when Petitioner ejaculated in her mouth, she thought that he had urinated. (Exh. 3 at 122.) Her mother, after the fact, explained to her what actually happened. (Exh. 3 at 122.) In view of E.B.'s testimony, the trial court ruled that defense counsel could cross-examine E.B. with respect to her prior knowledge of the term "blow job."

Petitioner alleges that the State's interpretation of the West Virginia Rape Shield law, that any evidence of prior false allegations by E.B. were inadmissible, should be construed as a <u>Brady</u> violation. Petitioner further alleges that the State violated his <u>Brady</u> rights when it refused to provide him copies of E.B.'s counseling records. The undersigned finds that Petitioner does not specifically

identify the false allegations made by E.B. that were withheld by the State. Although he attempted to elicit testimony that E.B. had a habit of falsely accusing other men of sexual improprieties, he was unable to establish the sexual misconduct. (Exh. 7 at 10-11, 16-19.) Furthermore, as Respondent argues, Petitioner has not demonstrated that <u>Brady</u> applies to state evidentiary rulings. Finally, Petitioner has not demonstrated that the trial court's decision to inspect the records in camera was a violation of clearly established federal law. <u>See</u> <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). Accordingly, Respondent's Motion with respect to his claim should be granted.

**III.   Denied fair trial when prosecuting attorney revealed to jury that defense counsel disclosed confidential work product to the State.**

In Ground Three of his Petition, Petitioner alleges that he was denied the right to a fair trial and to the effective assistance of counsel, when defense counsel disclosed confidential work product to the State Prosecuting Attorney, and that the State Prosecuting Attorney committed prosecutorial misconduct, when he implied that defense counsel revealed to him the identity of a key State witness. (Doc. No. 2 at 34-39.) In his Motion, Respondent argues that Petitioner's claims are without merit.

The standards established by the United States Supreme Court in determining whether or not a defendant was denied his Sixth Amendment right to effective assistance of counsel are set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  Ineffective assistance of counsel claims consist of mixed questions of fact and law.  <u>Id</u>.  Under the two-pronged standard, a Petitioner must show (1) that counsel's performance was so deficient that it fell below an objective standard of reasonableness, and (2) that counsel's deficiency resulted in prejudice so as to render the results of the trial unreliable.  <u>Id.</u> at 687-91, 104 S.Ct. at 2064-66. Counsel's performance is entitled to a  presumption of reasonableness and judicial review of counsel's strategic decisions

is highly deferential. Id. at 689, 104 S.Ct. at 2065. Thus, a petitioner challenging his conviction on the grounds of ineffective assistance must overcome a strong presumption that the challenged actions constituted sound trial strategies.  Id. The Court in Strickland cautioned against the ease in second-guessing counsel's unsuccessful assistance after the adverse conviction and sentence are entered.  Id. The Fourth Circuit Court of Appeals specifically recognized that ineffective assistance of counsel may not be established by a "Monday morning quarterbacking" review of counsel's choice of trial strategy. Stamper v. Muncie, 944 F.2d 170, 178 (4th Cir. 1991), aff'd, 985 F.2d 553 (4th Cir.) cert. denied, 506 U.S. 1087, 113 S.Ct. 1069, 122 L.Ed.2d 372 (1993). Applying this standard, and based upon all of the evidence of record, the Court will address the merits of each of Petitioner's allegations of ineffective assistance of counsel.

With respect to claims of prosecutorial misconduct, due process is not violated unless the alleged errors deprived Petitioner of the fundamental concepts of a fair trial.  United States v. Morsley, 64 F.3d 907 (4th Cir. 1991).  In United States v. Brockington, 849 F.2d 872 (4th Cir. 1988), the Fourth Circuit set out a two-part test for determining whether a prosecutor's comments denied due process.  Id. at 875.  First, the prosecutor's comments must have, in fact, been improper.  Id. Second, the prosecutor's comments must have been so prejudicial that the defendant was denied a fair trial.  Id.

State witness Heather Bowling, testified at trial that Petitioner confessed and admitted to her "that it did happen." (Exh. 4 at 82.) She testified that in late March, 2001, she ran into Petitioner at a bowling alley and later rode with him to a nearby lot where they talked. (Exh. 4 at 81.) Heather asked Petitioner what happened and at first, he denied that anything happened between him and E.B. (Exh. 4 at 82.) However, he later admitted that, "It happened." (Exh. 4 at 83.) She testified that she never told anyone about Petitioner's confession, until she was subpoenaed by defense counsel,

41

because she did not want any part of it. (Exh. 4 at 86-87.) After receiving the subpoena, Heather told

her mother and Mr. Burnette about Petitioner's confession. (Exh. 4 at 87.) Subsequently, she received

a subpoena by the State Prosecuting Attorney, which upset her. (Exh. 4 at 91.) Heather called Mr.

Burnette and asked him how Mr. Dolly found out about the confession. (Exh. 4 at 91.) Heather

testified that she never knew how the State learned of the confession. (Exh. 4 at 92.)

During opening statements, however, the State Prosecuting Attorney stated that he was not

aware of Petitioner's alleged confession to Heather Bowling until after Heather told defense counsel.

Petitioner asserts that this statement insinuates that defense counsel intended to keep this information

from the State. In response to Mr. Dolly's opening statements, defense counsel stated:

> Heather Bowling is the person who supposedly Alex confessed to. Well, Heather
> Bowling was Alex's girlfriend. I subpoenaed Heather Bowling when the trial - - the
> trial was scheduled in May. It was postponed. She calls me up, just like Steve Dolly
> said. "Why do you want me to testify? I don't want to testify." I said Heather, "All
> I want you to do is confirm the story, that you were in the shower, that Alex was
> outside." * * * You don't want me to testify . . . She said that he confessed to her. I
> said, "You're right, Heather. I don't want you - - if that's what you're going to say
> I don't want you - - why didn't you come forward before? Why didn't you tell the
> police this?" No real good reason. Well, then, it turns around and it happens that
> somebody calls the prosecution and says, "Did you know that Alex confessed to
> Heather?" . . . Heather called me back and went, "Man, did you tell the Prosecutor
> what I told you?" I said, "No, Heather, why would I tell?"

(Exh. 3 at 158-59.) Respondent argues that defense counsel's statements were intended to impeach

Heather's credibility and not to protect defense counsel from allegations of misconduct. Respondent

avers that the timing of Heather's confession created credibility issues: "Defense counsel was trying

to create a picture of a witness who was willing to say anything in order to avoid testifying. When

it suited her needs to say Petitioner confessed, that is what she says; however, when this statement

required her to testify for the State, she became angry." (Doc. No. 8 at 68.)

Based on the foregoing, the undersigned finds that Petitioner has not demonstrated that

42

defense counsel revealed confidential work product to the State. The Prosecuting Attorney's closing arguments indicates that he learned of Petitioner's confession through E.B.'s family, presumably her step-father, who worked with Heather. In his closing arguments, Mr. Dolly stated:

> You know, Mr. Burnette says that [Heather] called him when - - after I found out what she knew, after Mr. Burnette told me, like he was supposed to do, after I got the call from [E.B.'s] family that said, "We've heard that Heather Bowling, that the Defendant confessed to her." After I contacted her and she was upset. If she wanted to lie, if she didn't want to get involved, why didn't she just say, "Nope. Nope. Nope. I just said that so I wouldn't have to testify." I don't know any better.

(Exh. 5 at 158.) The undersigned further finds that Petitioner has not satisfied the first prong of the Brockington analysis; Mr. Dolly's comments did not imply that Mr. Burnette told him about Petitioner's confession. Accordingly, Petitioner's third ground for relief is without merit and Respondent's Motion should be granted.

## IV.     Ineffective Assistance of Counsel

In Ground Four of his Petition, Petitioner alleges that defense counsel rendered ineffective assistance in violation of his Sixth Amendment rights when he (A) failed to present certain defenses (Doc. No. 2 at 42-43.); (B) failed to impeach State witness, Heather Bowling (Doc. No. 2 at 43-44.); (C) waived Petitioner's constitutional rights (Doc. No. 2 at 44.); (D) allowed Trooper Cooper to testify that he believed the victim (Doc. No. 2 at 45.); and (E) failed to offer instructions of lesser included offenses or of limitation on hearsay or Rule 404(b) evidence. (Doc. No. 2 at 45-46.) Petitioner also alleges that the cumulative effect of defense counsel's ineffectiveness deprived him of a fair trial. (Doc. No. 2 at 40-42.)

### A.     Failure to Present Certain Defenses.

Petitioner alleges that defense counsel failed to (1) demonstrate through the testimony of a third party that E.B. could not have seen the clock inside his truck while fellating him, (Doc. No. 2

at 42-43.), (2) challenge Amanda Bowling's testimony to demonstrate that it was impossible for her to have seen E.B. fellating Petitioner due to the size constraints in the front of the cab (Doc. No. 2 at 43.), and (3) recognize as a defense the exception to the Rape/Shield statute. (Doc. No. 2 at 43.) Respondent addresses Petitioner's second allegation and argues that Petitioner was the most familiar with the inside of his truck and therefore, there was no need for a third party's testimony. (Doc. No. 8 at 78.) Additionally, Respondent avers that defense counsel provided the jury with a brochure demonstrating the interior of his truck. (Doc. No. 8 at 78.)

It is well recognized that trial counsel's failure to investigate mitigating circumstances and potential defenses may amount to ineffective assistance. See Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); Tucker v. Ozmint, 350 F.3d 433, 440 (4th Cir. 2003), cert. denied, 124 S.Ct. 2100, 158 L.Ed.2d 715 (2004). Without determining whether counsel's performance was deficient, the undersigned finds that Petitioner was not prejudiced by counsel's omission. Petitioner was most familiar with the interior of his truck and was competent to testify as to such. Additionally, defense counsel provided the jury with a brochure which indicated that the clock was in the same position as stated by Petitioner. Respondent's Motion does not address Petitioner's remaining claims, and therefore, the undersigned does not address them herein.

### B.   Failure to Impeach State's Witnesses.

Petitioner alleges that defense counsel failed to inquire of Heather Bowling as to the nature of the specific allegations to which Petitioner allegedly confessed. (Doc. No. 2 at 43-44.) He avers that based on E.B.'s and Heather's testimony, the confession could have referred to either a kiss, that Petitioner showed E.B. and Amanda his penis, or that he asked E.B. to perform fellatio. (Doc. No. 2 at 44.) "There was no tactical advantage in leaving the answer where it lay, the worse confession would be assumed." (Id.) Petitioner further avers:

44

> There is no possible tactical advantage to letting the worst assumption go unchallenged. A reasonable lawyer would have used this as an opportunity to remind the jury of E.B.'s prior inconsistent statement and that there were other things that he might be admitting did happen. Even her admission that she did not know specifically what he was referring to would be better than leaving it to the juror's imagination. (This is also an indication of lack of preparation, that he didn't fully explore her statement when he had the opportunity).

(Id.) Respondent argues that because Petitioner's counsel chose to pursue post-trial remedies under W.Va. R. Crim. P. 33 instead of filing a state *habeas* petition, defense counsel was not called to testify and the reasons for his actions have not been developed. (Doc. No. 8 at 79.) Nevertheless, Respondent argues that defense counsel's reasons not to develop the contents of Petitioner's alleged confession were "hardly unreasonable":

> Even if he had confessed that he had not used force, or that he did not show the victim his penis before asking her for oral sex, why would competent defense counsel risk having yet another witness state that the Petitioner had received oral sex from an 11-year old girl. What other possible meaning could the word "it" mean, given the context of the conversation. If "it" was ambiguous, why give the witness the opportunity to clear up the ambiguity? If anyone deserves blame, it is counsel for the State. He should have developed this further, counsel for the defense was far better off leaving it alone.

(Id.)

The undersigned finds that defense counsel's decision to forego clarification was one based on trial strategy. As Respondent argues, the worst case scenario was that the jury assumed "it" meant that E.B. fellated him.  Rather than have another witness testify that "Petitioner received oral sex from an 11-year-old girl," defense counsel decided to not broach the subject. The undersigned therefore finds that counsel's conduct was not unreasonable. Furthermore, Petitioner has not demonstrated how defense counsel's omission prejudiced him. Accordingly, this claim is without merit.

## C.     __Waiver of Constitutional Rights.__

Petitioner alleges that counsel improperly introduced evidence of Petitioner's decision to waive his Fifth Amendment rights when he gave a statement to Trooper Cooper without the advice of counsel. (Doc. No. 2 at 44.) Respondent argues that although defense counsel's strategy was not the most effective strategy, "it did not fall below an objectively reasonable standard of performance. Counsel did not introduce the testimony in order to create the inference that his client was guilty. Because this case revolved around the jury's credibility decisions a reasonable attorney might have introduced this evidence in order to explain why the Petitioner did not give a voluntary statement." (Doc. No. 8 at 83.) As Respondent further argues, the jury could have easily determined that Petitioner was the only one of three witnesses who did not give a voluntary statement to the police. (Doc. No. 8 at 83.) Based on Respondent's argument and without determining whether counsel's performance was deficient, the undersigned finds that Petitioner has not demonstrated that he was prejudiced by counsel's conduct. Accordingly, this claim must be dismissed.

### D.      Trooper Cooper's Testimony.

Petitioner alleges that defense counsel was ineffective when he permitted Trooper Cooper to testify on the ultimate issue of guilt or innocence. (Doc. No. 2 at 45.) Petitioner specifically references the phrase: "[O]n whether you should be able to rely on [E.B.] and [Amanda] in determining where the Defendant and [E.B.] had [E.B.] perform oral sex on him." (Doc. No. 2 at 45, citing Exh. 5 at 111.) Respondent argues that this statement is taken out of context. (Doc. No. 8 at 84.) Defense counsel called Trooper Cooper to expose the weaknesses of his investigation. On re-direct-examination, defense counsel asked if he made any effort to investigate E.B.'s and Amanda's credibility after obtaining their statements. (Exh. 5 at 107.) On re-cross the State reasonably asked whether there was any further investigation he could have done which would have caused him to doubt E.B.'s credibility. The undersigned finds that defense counsel's line of questioning constitutes

a matter of trial strategy, aimed at exposing the weaknesses in Trooper Cooper's investigation. As such, counsel's conduct cannot constitute ineffective assistance, irrespective of the success of the strategy.

### E.    Failed to Offer Instructions.

Petitioner also alleges that defense counsel failed to propose lesser included offense instructions, including first degree sexual assault, W.Va. Code § 61-8B-7 or third degree sexual assault, W.Va. Code § 61-8B-5. (Doc. No. 2 at 45-46.) Respondent argues that counsel's decision not to request lesser included offense instructions was a reasonable tactical decision. (Doc. No. 8 at 85.) Respondent argues that third degree sexual assault is not a lesser included offense of first degree sexual assault, "and once a petitioner is indicted for First Degree Sexual Assault he is not entitled to an instruction on Third Degree Sexual Assault." (Doc. No. 8 at 86.) Furthermore, Respondent argues that Petitioner was not entitled to an instruction on first degree sexual abuse because he engaged in "sexual intercourse," and not merely in "sexual contact," which is required for the abuse. (Doc. No. 8 at 86.) The undersigned agrees with Respondent and finds that the evidence did not demonstrate that E.B. only touched Petitioner's penis and therefore, a lesser-included instruction was not permitted under state law. For similar reasons, the undersigned finds that defense counsel's conduct constituted sound trial strategy and therefore, Petitioner's remaining claims are without merit.

### F.    Failure to appear prepared and to select appropriate jury.

Petitioner first alleges that counsel rendered ineffective assistance when he arrived in Court without his jacket and stated that "[h]alf the factual situation that Mr. Dolly described is news to me." (Doc. No. 2 at 41.) As Respondent argues, the undersigned finds that the absence of a jacket neither demonstrates that counsel was deficient, nor that Petitioner suffered prejudice therefrom. Additionally, the undersigned finds that Petitioner read counsel's statement out of context. In

47

response to Mr. Dolly's opening statement, defense counsel stated: "Half the factual situation that Mr. Dolly described is news to me. It's not what the girls told Trooper Cooper. That's not what is in their tape-recorded statement that you're going to hear." (Exh. 3 at 153.) Accordingly, the undersigned finds that Petitioner's claims do not rise to the level of a constitutional violation.

Second, Petitioner contends that defense counsel selected a jury that was more suitable for a prosecutor, "complete with a juror with ties to the Family Refuge Center." (Doc. No. 2 at 41.)As discussed above, Petitioner alleged that Juror Mooney had extraneous communications with a member of the FRC based on his friendly disposition toward her. "Jurors, however, are presumed to be impartial, absent indications to the contrary." Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987). In the absence of contrary evidence, the undersigned finds that counsel chose an impartial jury, and his claims of ineffective assistance must be dismissed.. [4]

## V.      Alternative Sentencing / Probation.

Finally, Petitioner alleges that the trial court violated his Fifth Amendment right against self-incrimination when it denied him probation based upon his refusal to admit that he engaged in oral sex with E.B., an eleven year old victim. (Doc. No. 2 at 46-50.) Petitioner avers that the trial court refused to consider him for alternative sentencing, probation, or treatment under the Youthful Offender Act, W.Va. Code  § 25-4-6, because he would not admit that he had committed the offense of conviction. (Exh. 4 at 27.) Respondent argues that "Petitioner need not admit guilt to receive probation. All he need do is express remorse and agree to participate in counseling." (Doc. No. 8 at 89.) However, Petitioner did not, despite the trial court's hope that he would have sought counseling

---

[4] The undersigned notes that any remaining claims of ineffective assistance of counsel were not addressed on their merits by Respondent in his Motion. Accordingly, the undersigned finds that Respondent should be instructed to file a further response to all of Petitioner's claims at a later date.

while awaiting sentencing. (Doc. No. 8 at 89; Exh. 7 at 33.)

Pursuant to W.Va. Code § 62-12-2 (e), Petitioner was eligible for a term of probation if he satisfied the requirements of the statute:

> In the case of any person who has been found guilty of, or pleaded guilty to, a felony or misdemeanor under the provisions of section twelve or twenty-four, article eight, chapter sixty-one of this code, or under the provisions of article eight-c or eight-b of said chapter, such person shall only be eligible for probation after undergoing a physical, mental and psychiatric study and diagnosis which shall include an on-going treatment plan requiring active participation in sexual abuse counseling at a mental health facility or through some other approved program: Provided, That nothing disclosed by the person during such study or diagnosis shall be made available to any law-enforcement agency, or other party without the person's consent, or admissible in any court of this state, unless such information disclosed shall indicate the intention or plans of the probationer to do harm to any person, animal, institution or property, in which case such information may be released only to such persons as might be necessary for protection of the said person, animal, institution or property.

At sentencing, Petitioner presented the testimony of Michael Morello, a licensed psychologist, who testified that pursuant to the statute, he could enroll Petitioner in a program for sex offenders that is comparable to programs offered in prisons and that would meet the standards of the profession for sex offenders. (Exh. 4 at 21-22.) However, Mr. Morello testified that Petitioner denied the crime after having been adjudged guilty. (Id. at 21.) Nevertheless, Mr. Morello viewed this problem as a legal issue and thought that Petitioner nevertheless could benefit from participation in the program. (Id. at 21, 39.) Mr. Morello noted, however, that his report was based primarily on Petitioner's self-report and lacked independent verification. (Id.) The trial court, recognized that § 62-12-2(e) adequately protected a defendant's Fifth Amendment rights and noted that Petitioner had not participated in counseling in the approximate one year's time since he was convicted and released on bond. (Exh. 7 at 32-35.)

> [W.Va. Code § 62-12-2(c)(1)(D)(e)] provides that a person who is convicted as you were under this section of code shall only be eligible for probation after undergoing a physical, mental, and psychiatric study and diagnosis, which shall include an

49

> ongoing treatment plan requiring active participation in sexual abuse counseling at a
> mental health facility or through some other approved program. And the statute
> goes further in saying that whatever you disclose to that person or in that study cannot be
> used by Mr. Dolly or by law enforcement or is admissible in court. And so your Fifth
> Amendment rights are protected by the statute.

(Exh. 7 at 32-33.)

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case
to be a witness against himself." U.S. Const. amend. V. Citing State v. Imlay, 249 Mont. 82, 813 P.2d
979 (1991), Petitioner contends that the trial court improperly denied him probation based on his
failure to admit he committed the crime of conviction. In Imlay, the Montana Supreme Court held
that a sexual assault defendant's suspended sentence, conditioned upon his completion of a sexual
therapy program, could not be revoked where the basis for his failure to complete the program was
his refusal to admit guilt. The Court stated: "[A]bsent any grant of immunity" from prosecution for
incriminating statements made during such therapy programs, the Fifth Amendment "prohibit[s]
augmenting a defendant's sentence because he refuses to confess to a crime or invokes his privilege
against self-incrimination. Id. at 91, 813 P.2d at 985. Citing Minnesota v. Murphy, 465 U.S. 420, 426,
104 S.Ct. 1136, 1141, 79 L.Ed. 409 (1984), however, Respondent argues that the trial court's decision
was not contrary to clearly established federal law. In Murphy, the Supreme Court held:

> The Fifth Amendment, in relevant part, provides that no person "shall be compelled
> in any criminal case to be a witness against himself." It has long been held that this
> prohibition not only permits a person to refuse to testify against himself at a criminal
> trial in which he is a defendant, but also "privileges him not to answer official
> questions put to him in any other proceeding, civil or criminal, formal or informal,
> where the answers might incriminate him in future criminal proceedings."

Murphy, 465 U.S. at 426, 104 S.Ct. at 1141. With respect to probation revocation proceedings, the
Supreme Court held:

> Our cases indicate, moreover, that a State may validly insist on answers to even
> incriminating questions and hence sensibly administer its probation system, as long

as it recognizes that the required answers may not be used in a criminal proceeding
and thus eliminates the threat of incrimination.

Id. at 435, n. 7, 104 S.Ct. at 1146, n. 7.

Based on the foregoing, the undersigned finds that Petitioner has not demonstrated that the

trial court compelled him to admit his guilt in violation of the Fifth Amendment. It appears that the

trial court denied his request for probation based on several factors, including his failure to seek

treatment prior to sentencing. More importantly however, less than one month after he was convicted,

Petitioner, while on bond, arranged for a fifteen year old girl to come to his house where he asked

her to perform oral sex. (Exh. 15 at 26-27.) Based on this conduct, the trial court stated:

> So, its apparent to me that as I indicated that you have not profited from your
> experience so far. You have no insight as to your problem. You don't seem to have
> the ability to benefit from any counseling, certainly not from outpatient basis. You're
> not likely to benefit from any community treatment. And I am convinced, based upon
> your history, particularly based upon the trick tat you pulled with that fifteen-year old
> girl after her mother - after you lied to her mother about how you were first and then
> you tell the folks at Anthony [Correctional Center] that you didn't know how old she
> was. And then after she told you to leave her daughter alone, according to the
> testimony, you fetched her in the middle of the night and had her brought to your
> bedroom. And I may have been born during the day, but I wasn't born yesterday and
> when you actually have the audacity and the absolute disregard for a fifteen-year-old
> to ask her to give you oral sex after you were convicted of that is just astounding to
> me.

(Exh. 7 at 34-35.) It is clear that the trial court's sentencing decision rested heavily on Petitioner's

post-conviction conduct which was similar to his offense of conviction. Accordingly, the undersigned

finds that Petitioner's claim is without merit and that Respondent's Motion should be granted.[5]

---

[5] The undersigned further finds that Petitioner did not possess a constitutional right to
receive a sentence of probation. *See Morrisey v. Brewer*, 408 U.S. 471, 480-90, 92 S.Ct. 2593, 33
L.Ed. 484 (1972); *Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 36 L.Ed. 656 (1973).
Although the Fourteenth Amendment of the United States Constitution prohibits a State from
depriving "any person of life, liberty, or property, without due process of law", the range of
protected liberty interests for defendants convicted and confined in prison are significantly
reduced for the period of incarceration. *See* U.S. Const. amend. XIV, § 1; *Gaston v. Taylor*, 946

## PROPOSAL AND RECOMMENDATION

Accordingly, the undersigned hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **DENY in part and GRANT in part** Respondent's Motion for Summary Judgment (Doc. No. 8.) and refer this matter back to the undersigned for scheduling of further proceedings.

The parties are hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Joseph R.

_____

F.2d 340, 343 (4th Cir. 1991). The fact of conviction and imprisonment implies the defendant's transfer of his liberty to prison officials, who in their broad discretion, administer his sentence. *Gaston*, 946 F.2d at 343. Nevertheless, "confinement to prison does not strip a prisoner of *all* liberty interests." Id. (emphasis added) To determine whether an inmate retains a certain liberty interest, the Court must look to the nature of the claimed interest and determine whether the Due Process Clause applies. *See Board of Regents v. Roth*, 408 U.S. 564, 570-71, 92 S.Ct. 2701, 2705-06, 33 L.Ed.2d 548 (1972). An inmate holds a protectible right in those interests to which he has a legitimate claim of entitlement. *Greenholtz v. Inmates of Nebraska Penal and Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979)(*quoting Roth*, 408 U.S. at 577, 92 S.Ct. 2709). In Gaston, the Fourth Circuit determined that an inmate possesses a claim of entitlement in those interests "which were not taken away expressly or by implication, in the original sentence to confinement." Id. at 343. A State may create for an inmate a protected liberty interest not found in the Constitution of the United States by establishing explicit and mandatory "procedures that sufficiently channel the discretion of prison officials." *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)(recognizing state created liberty interest in good time credit); *See also, Ewell v. Murray*, 11 F.3d 482, 488 (4th Cir. 1993); *Stewart v. Bailey*, 7 F.3d 384, 392 (4th Cir. 1993)(stating that the State procedures "must create 'substantive predicates' to guide the decisionmaker's discretion, such as 'specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow.'")(citations omitted). Such interests however,

> will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995)(citations omitted).

Goodwin. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have thirteen days (ten days, filing of objections and three days, mailing/service) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.) cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Goodwin, and this Magistrate Judge.

The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and to mail a copy of the same to counsel of record.

ENTER: February 28, 2006.

R. Clarke VanDervort
United States Magistrate Judge

53